UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

THE ESTATE OF TERRILL THOMAS, by and
through its special administrator, Tiffany
Robertson,

        Plaintiffs,

        v.

MILWAUKEE COUNTY; DAVID A.
CLARKE, JR.; NANCY EVANS; KEVIN
NYKLEWICZ; SCOTT SOBEK; JEFFREY
ANDRYKOWSKI; JOSHUA BRIGGS;
STEVEN HAW; KASHKA MEADORS;
DEVONTA TOWNES; RAFAEL BRITO;
MATTHEW CARROLL; LECARLIN
COLLINS; BRIAN DRAGOO; ANTHONY
EMANUELE; JORDON JOHNSON; THOMAS
LAINE; DAVID LEDGER; JOSHUA LEGERE;
DEVIN O'DONNELL; JAMES RAMSEY GUY;
DECORIE SMITH; DOMINIQUE SMITH;
JOHN WEBER; ARMOR CORECTIONAL
HEALTH SERVICES, INC.; KAREN
HORTON; KAREN GRAY; DEBORAH
MAYO; and AMANDA OCACIO,

        Defendants.

Case No.: 17-cv-01128

---

**ANSWER TO COMPLAINT AND AFFIRMATIVE DEFENSES**

---

    Defendants Armor Correctional Health Services, Inc. ("Armor"), Karen Horton

("Horton"), Karen Gray ("Gray"), Amanda Ocacio ("Ocacio"), and Deborah Mayo ("Mayo," and

collectively "Defendants"), by their attorneys, Hinshaw & Culbertson LLP, answer the Plaintiff's

Complaint as follows:

# I.    INTRODUCTION

1.    This is a civil rights action under 42 U.S.C. §1983, the Americans with Disabilities Act, and Wisconsin law, challenging the egregious mistreatment of Terrill J. Thomas, a 38-year old mentally ill man who suffered and died of profound dehydration in the Milwaukee County Jail after jail officials deprived him of water for seven consecutive days in April, 2016.

**ANSWER:**    Admit only that the plaintiff has filed this lawsuit under those laws and that Terrill Thomas died from dehydration in the Milwaukee County Jail. Deny deprivation of rights and/or wrongdoing. Deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph and put Plaintiff to its proof.

2.    When Terrill Thomas arrived at the Milwaukee County Jail, he was suffering from an acute mental health crisis and was in urgent need of medical attention.  Instead of providing him with such care, jail officials knowingly allowed him to decompensate.  When his mental illness and lack of treatment caused him to engage in odd and disturbing behavior, Defendants punished him by locking him in a small isolation cell and deliberately cutting off his only source of drinking water.  For seven straight days, from April 7, 2016 until his death on April 24, 2016, Mr. Thomas remained locked alone in his cell, 24 hours a day, as he literally died of thirst.

**ANSWER:**    Deny deprivation of rights and/or wrongdoing. Deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph and put Plaintiff to its proof.

3.    Mr. Thomas was neither the first nor the last person to be subjected to this cruel form of punishment in the Milwaukee County Jail, administered by Milwaukee County Sheriff David Clarke, Jr.  Both before and after the death of Mr. Thomas, jail staff punished multiple

2

300644049v1 0990034

prisoners by withholding water, reflecting a common and widespread practice, knowingly sanctioned by Sheriff Clarke and other jail officials.

**ANSWER:** Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

4. In addition to locking him in an isolation cell and cutting off his water supply, defendants further punished Mr. Thomas by removing his mattress and bedding, leaving him nothing to lie n but bare concrete. They also deprived him of edible food, a functioning toilet, access to a shower, a sanitary living environment, any relief from 24-hour lockdown, and urgently needed medical and mental health care.

**ANSWER:** Deny deprivation of rights and/or wrongdoing. Deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph and put Plaintiff to its proof.

5. The Estate of Terrill Thomas brings this action to hold Defendants accountable for subjecting Mr. Thomas to unconscionable pain and suffering and causing his death, in violation of the Fourteenth Amendment to the United States Constitution, the Americans with Disabilities Act, and Wisconsin Law.

**ANSWER:** Admit only that the plaintiff has filed this lawsuit under those laws. Deny deprivation of rights and/or wrongdoing.

## II.    JURISDICTION AND VENUE

6. This Court has original jurisdiction over this matter under 28 U.S.C. §1331 (federal question) and 28 U.S.C. §1343 (civil rights).

3

300644049v1 0990034

**ANSWER:** Admit that the plaintiff seeks to invoke the jurisdiction of this court pursuant to the above-referenced statute. Deny all remaining allegations.

7. The Court has supplemental jurisdiction over Plaintiff's state law claim under 28 U.S.C. §1367(a).

**ANSWER:** Admit that the plaintiff seeks to invoke the supplemental jurisdiction of this court pursuant to the above-referenced statute. Deny all remaining allegations.

8. Venue in this district is proper under 28 U.S.C. §1391(b)(2) because the conduct giving rise to Plaintiff's claims occurred in this judicial district.

**ANSWER:** Admit that the events giving rise to the alleged claims took place within the Eastern District and that some of the defendants are located in the Eastern District. Deny all remaining allegations.

### III. PARTIES

**A. Plaintiff**

9. Plaintiff is the Estate of Terrill Thomas, acting through its court-appointed special administrator, Tiffany Robertson. Terrill Thomas was a United States citizen and resident of Milwaukee, Wisconsin. He was 38 years old when he died at the Milwaukee County Jail on April 24, 2016. His estate was duly formed under the laws of the State of Wisconsin. Throughout his confinement at the Milwaukee County Jail in April 2016, Mr. Thomas was a pretrial detainee. He was also a qualified individual with a disability as defined by 42 U.S.C. §12131(2).

4

300644049v1 0990034

**ANSWER:**    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

## B. County Defendants

10.    Defendant Milwaukee County is a municipal corporation, organized under the laws of the State of Wisconsin.  Milwaukee County is a "person" for purposes of 42 U.S.C. §1983 and a "public entity" under 42 U.S.C. §12131(1).  Milwaukee County owns and operates the Milwaukee County Jail.  Acting through the Milwaukee County Sheriff's Office, the County is responsible for training, supervising, and disciplining all jail employees; adopting, implementing, and enforcing jail policies and practice; and ensuring that jail conditions and the treatment of inmates complies with the United States Constitution and other federal, state, and local laws.  The County is liable for the jail policies, practices, and customs that caused the harm alleged below.  Under Wis. Stat. §895.46(1)(a), the County is required to pay or indemnify all judgments, including for compensatory and punitive damages, attorneys' fees, and costs that may be awarded against its officials and employees.

**ANSWER:**    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

11.    Defendant David A. Clarke, Jr. is the sheriff of Milwaukee County and had direct control over the management and operations of the Milwaukee County Jail at the time of Mr. Thomas' death and for almost 14 years preceding it.   He was responsible for training, supervising, and disciplining jail employees; adopting, implementing, and enforcing jail policies and practices; and ensuring that jail conditions and the treatment of inmates complied with the United States Constitution and other federal, state, and local laws, as well as written jail policies.

5

300644049v1 0990034

Under Wis. Stat. §302.336(2), Defendant Clarke is legally responsible for the confinement, maintenance and medical care of all persons confined in the Milwaukee County Jail.

**ANSWER:**    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

12.    Defendant Nancy Evans is a citizen residing in the State of Wisconsin. Defendant Evans was the commander of the Milwaukee County Jail and an employee of the Milwaukee County Sheriff's Office during the relevant timer period. In that role, she had direct control over the management and operations of the Milwaukee County Jail at the time of Mr. Thomas' death and for approximately one ear preceding it. She was responsible for training and supervising jail employees; adopting, implementing, and enforcing jail policies; and ensuring that jail conditions and the treatment of inmates complied with the United States Constitution and other federal, state, and local laws, as well as written jail policies.

**ANSWER:**    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

13.    Defendant Kevin Nyklewicz is a citizen residing in the State of Wisconsin. Defendant Nyklewicz was the deputy inspector of the Milwaukee County Jail and an employee of the Milwaukee County Sheriff's Office during the relevant time period. In that role, he had direct control over the management and operations of the Milwaukee County Jail at the time of Mr. Thomas' death. He was responsible for training and supervising jail employees; adopting, implementing and enforcing jail policies; and ensuring that jail conditions and the treatment of inmates complied with the United States Constitution and other federal, state, and local laws, as well as written jail policies.

6

300644049v1 0990034

**ANSWER:**    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

14.    Defendant Scott Sobek is a citizen residing in the State of Wisconsin.  Defendant Sobek was a captain in the Milwaukee County Jail and an employee of the Milwaukee County Sheriff's Office during the relevant time period.  In that role he supervised jail staff and had a duty to ensure that jail conditions and the treatment of the inmates complied with the United States Constitution and other federal, state, and local laws as well as written jail policies.  His duties involved inspecting the jails segregation unit (4D) one or more times between April 17 and April 24, 2016.

**ANSWER:**    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

15.    Defendant Jeffrey Andrykowski is a citizen residing in the State of Wisconsin. Defendant Andrykowski was a lieutenant in the Milwaukee County Jail and an employee of the Milwaukee County Sheriff's Office during the relevant time period.  In that role he supervised correctional officers and had a duty to ensure that jail conditions and the treatment of inmates complied with the United States Constitution and other federal, state, and local laws, as well as written jail policies.  His duties involved inspecting the jail's segregation unit (4D) one or more times between April 17 and April 24, 2016.

**ANSWER:**    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

16.    Defendant Joshua Briggs is a citizen residing in the State of Wisconsin. Defendant Briggs was a lieutenant in the Milwaukee County Jail and an employee of the

7

300644049v1 0990034

Milwaukee County Sheriff's Office during the relevant time period. In that role he supervised correctional officers and had a duty to ensure that jail conditions and the treatment of inmates complied with the United States Constitution and other federal, state, and local laws, as well as written jail policies. His duties involved inspecting the jail's segregation unit (4D) one or more times between April 17 and April 24, 2016.

**ANSWER:** Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

17. Defendant Steven Haw is a citizen residing in the State of Wisconsin Defendant Haw was a lieutenant in the Milwaukee County Jail and an employee of the Milwaukee County Sheriff's Office during the relevant time period. In that role he supervised correctional officers and had a duty to ensure that jail conditions and the treatment of inmates complied with the United States Constitution and other federal, state, and local laws, as well as written jail policies. His duties involved inspecting the jail's segregation unit (4D) one or more times between April 17 and April 24, 2016.

**ANSWER:** Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

18. Defendant Kashka Meadors is a citizen residing in the State of Wisconsin. Defendant Meadors was a lieutenant in the Milwaukee County Jail and an employee of the Milwaukee County Sheriff's Office during the relevant time period. In that role she supervised correctional officers and had a duty to ensure that jail conditions and the treatment of inmates complied with the United States Constitution and other federal, state, and local laws, as well as

8

300644049v1 0990034

written jail policies. Her duties involved inspecting the jail's segregation unit (4D) one or more times between April 17 and April 24, 2016.

**ANSWER:**   Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

19.     Defendant Devonta Townes is a citizen residing in the State of Florida. Defendant Townes was a lieutenant in the Milwaukee County Jail and an employee of the Milwaukee County Sheriff's Office during the relevant time period. In that role he supervised correctional officers and had a duty to ensure that jail conditions and the treatment of inmates complied with the United States Constitution and other federal, state, and local laws, as well as written jail policies. His duties involved inspecting the jail's segregation unit (4D) one or more times between April 17 and April 24, 2016.

**ANSWER:**   Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

20.     Defendant Rafael Brito is a citizen residing in the State of Wisconsin. Defendant Brito was a correctional officer at the Milwaukee County Jail and an employee of the Milwaukee County Sheriff's Office during the relevant time period. In that role he was responsible for the health, safety, security, and welfare of inmates confined in the jail, including Mr. Thomas. He worked in the segregation unit (4D) one or more times between April 17 and April 24, 2016.

**ANSWER:**   Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

21.     Defendant Matthew Carroll is a citizen residing in the State of Wisconsin. Defendant Carroll was a correctional officer at the Milwaukee County Jail and an employee of

9

300644049v1 0990034

the Milwaukee County Sheriff's Office during the relevant time period. In that role he was responsible for the health, safety, security, and welfare of inmates confined in the jail, including Mr. Thomas. He worked in the segregation unit (4D) one or more times between April 17 and April 24, 2016.

**ANSWER:** Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

22. Defendant LeCarlin Collins is a citizen residing in the State of Wisconsin. Defendant Collins was a correctional officer at the Milwaukee County Jail and an employee of the Milwaukee County Sheriff's Office during the relevant time period. In that role he was responsible for the health, safety, security, and welfare of inmates confined in the jail, including Mr. Thomas. He worked in the segregation unit (4D) one or more times between April 17 and April 24, 2016.

**ANSWER:** Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

23. Defendant Brian Dragoo is a citizen residing in the State of Wisconsin. Defendant Dragoo was a correctional officer at the Milwaukee County Jail and an employee of the Milwaukee County Sheriff's Office during the relevant time period. In that role he was responsible for the health, safety, security, and welfare of inmates confined in the jail, including Mr. Thomas. He worked in the segregation unit (4D) one or more times between April 17 and April 24, 2016.

**ANSWER:** Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

10

300644049v1 0990034

24.     Defendant Anthony Emanuele is a citizen residing in the State of Wisconsin. Defendant Emanuele was a correctional officer at the Milwaukee County Jail and an employee of the Milwaukee County Sheriff's Office during the relevant time period.  In that role he was responsible for the health, safety, security, and welfare of inmates confined in the jail, including Mr. Thomas.  He worked in the segregation unit (4D) one or more times between April 17 and April 24, 2016.

**ANSWER:**     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

25.     Defendant JorDon Johnson is a citizen residing in the State of Wisconsin. Defendant Johnson was a correctional officer at the Milwaukee County Jail and an employee of the Milwaukee County Sheriff's Office during the relevant time period.  In that role he was responsible for the health, safety, security, and welfare of inmates confined in the jail, including Mr. Thomas.  He worked in the segregation unit (4D) one or more times between April 17 and April 24, 2016.

**ANSWER:**     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

26.     Defendant Thomas Laine is a citizen residing in the State of Wisconsin. Defendant Laine was a correctional officer at the Milwaukee County Jail and an employee of the Milwaukee County Sheriff's Office during the relevant time period.  In that role he was responsible for the health, safety, security, and welfare of inmates confined in the jail, including Mr. Thomas.  He worked in the segregation unit (4D) one or more times between April 17 and April 24, 2016.

11

300644049v1 0990034

**ANSWER:**    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

27.    Defendant David Ledger is a citizen residing in the State of Wisconsin. Defendant Ledger was a correctional officer at the Milwaukee County Jail and an employee of the Milwaukee County Sheriff's Office during the relevant time period.  In that role he was responsible for the health, safety, security, and welfare of inmates confined in the jail, including Mr. Thomas.  He worked in the segregation unit (4D) one or more times between April 17 and April 24, 2016.

**ANSWER:**    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

28.    Defendant Joshua Legere is a citizen residing in the State of Wisconsin. Defendant Legere was a correctional officer at the Milwaukee County Jail and an employee of the Milwaukee County Sheriff's Office during the relevant time period.  In that role he was responsible for the health, safety, security, and welfare of inmates confined in the jail, including Mr. Thomas.  He worked in the segregation unit (4D) one or more times between April 17 and April 24, 2016.

**ANSWER:**    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

29.    Defendant Devin O'Donnell is a citizen residing in the State of Wisconsin. Defendant O'Donnell was a correctional officer at the Milwaukee County Jail and an employee of the Milwaukee County Sheriff's Office during the relevant time period.  In that role he was responsible for the health, safety, security, and welfare of inmates confined in the jail, including

12

300644049v1 0990034

Mr. Thomas. He worked in the segregation unit (4D) one or more times between April 17 and April 24, 2016.

**ANSWER:** Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

30. Defendant James Ramsey-Guy is a citizen residing in the State of Wisconsin. Defendant Ramsey-Guy was a correctional officer at the Milwaukee County Jail and an employee of the Milwaukee County Sheriff's Office during the relevant time period. In that role he was responsible for the health, safety, security, and welfare of inmates confined in the jail, including Mr. Thomas. He worked in the segregation unit (4D) one or more times between April 17 and April 24, 2016.

**ANSWER:** Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

31. Defendant Decorie Smith is a citizen residing in the State of Wisconsin. Defendant Smith was a correctional officer at the Milwaukee County Jail and an employee of the Milwaukee County Sheriff's Office during the relevant time period. In that role he was responsible for the health, safety, security, and welfare of inmates confined in the jail, including Mr. Thomas. He worked in the segregation unit (4D) one or more times between April 17 and April 24, 2016.

**ANSWER:** Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

32. Defendant Dominique Smith is a citizen residing in the State of Wisconsin. Defendant Smith was a correctional officer at the Milwaukee County Jail and an employee of the

13

300644049v1 0990034

Milwaukee County Sheriff's Office during the relevant time period. In that role he was responsible for the health, safety, security, and welfare of inmates confined in the jail, including Mr. Thomas. He worked in the segregation unit (4D) one or more times between April 17 and April 24, 2016.

**ANSWER:** Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

33. Defendant John Weber is a citizen residing in the State of Wisconsin. Defendant Weber was a correctional officer at the Milwaukee County Jail and an employee of the Milwaukee County Sheriff's Office during the relevant time period. In that role he was responsible for the health, safety, security, and welfare of inmates confined in the jail, including Mr. Thomas. He worked in the segregation unit (4D) one or more times between April 17 and April 24, 2016.

**ANSWER:** Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

34. All individual County Defendants named above were acting under color of state law during the relevant time period and are sued in their individual capacities.

**ANSWER:** Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

## C. Armor Medical Defendants

35. Defendant Armor Correctional Healthcare Service, Inc. ("Armor") is a for-profit correctional healthcare corporation, incorporated under the laws of the State of Florida, doing business in the State of Wisconsin. Armor's Principal Office is located at 4960 S.W. 72nd

14

300644049v1 0990034

Avenue, Suite #400, Miami, FL 33155, with its Registered Agent being CT Corporation System located at 8020 Excelsior Dr., Ste. 200, Madison, WI 53717. Armor is considered a "person" for purposes of 42 U.S.C. §1983. Armor acted under color of state law to provide medical and mental health services to inmates at the Milwaukee County Jail, pursuant to a contract with the County. Armor was responsible for adopting, implementing, and enforcing policies and practices pertaining to medical and mental health care for Milwaukee County Jail inmates. Armor also was responsible for ensuring that the care provided to those inmates met minimum constitutional and other legal standards and requirements.

**ANSWER:** Admit that Armor is a for-profit corporation incorporated in Florida, with its principal office at 4960 S.W. 72nd Avenue, Suite #400, Miami, FL 33155, and with its registered agent as CT Corporation System located at 8020 Excelsior Dr., Ste. 200, Madison, WI 53717. Further admit that Armor provided healthcare services to inmates at the Milwaukee County Jail pursuant to a contract with Milwaukee County. Deny all remaining allegations.

36. Defendant Karen Horton, M.D. is a citizen residing in the State of Wisconsin. Defendant Horton was the medical director for the Milwaukee County Jail and an employee of Armor Correctional Health Services, Inc. during the relevant time period. In that role, she was responsible for the health and welfare of inmates confined in the jail, including Mr. Thomas.

**ANSWER:** Admit that Horton is a citizen of Wisconsin, was medical director for the Milwaukee County Jail, and was an Armor employee during the relevant time period.. Deny all remaining allegations.

37. Defendant Karen Gray, R.N. is a citizen residing in the State of Wisconsin. Defendant Gray was a nurse at the Milwaukee County Jail and an employee of Armor

15

Correctional Health Services, Inc. during the relevant time period. In that role she was responsible for the health and welfare of inmates confined in the jail, including Mr. Thomas.

**ANSWER:** Admit that Gray is a citizen of Wisconsin, was a nurse at the Milwaukee County Jail, and was an Armor employee during the relevant time period. Deny all remaining allegations.

38. Defendant Deborah Mayo, ARNP MH is a citizen residing in the State of Wisconsin. Defendant Mayo was a psychiatric nurse practitioner at the Milwaukee County Jail and an employee of Armor Correctional Health Services, Inc. during the relevant time period. In that role she was responsible for the health and welfare of inmates confined in the jail, including Mr. Thomas.

**ANSWER:** Admit that Mayo is a citizen of Wisconsin and was a psychiatric nurse practitioner at the Milwaukee County Jail during the relevant time period. Deny that Mayo was or is an employee of Armor. Deny all remaining allegations.

39. Defendant Amanda Ocacio, LPN is a citizen residing in the State of Wisconsin. Defendant Ocacio was an LPN at the Milwaukee County Jail and an employee of Armor Correctional Health Services, Inc. during the relevant time period. In that role, she was responsible for the health and welfare of inmates confined in the jail, including Mr. Thomas.

**ANSWER:** Admit that Ocacio is a citizen of Wisconsin, was an LPN at the Milwaukee County Jail, and was an Armor employee during the relevant time period. Deny all remaining allegations.

40. All individual Armor medical defendants named above were acting under color of state law during the relevant time period and are sued in their individual capacities.

16

300644049v1 0990034

**ANSWER:**    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

## IV.    FACTUAL ALLEGATIONS

### A.  Terrill Thomas' Suffering and Death in the Milwaukee County Jail

41.    On April 15, 2016, City of Milwaukee Police Department officers arrested Mr. Thomas and brought him to a police station holding cell.  At the time of his arrest, Mr. Thomas, who suffered from bipolar disorder and other medical conditions, was experiencing a mental health crisis

**ANSWER:**    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

42.    Police video shows Mr. Thomas alone in the holding cell, shirtless, appearing to have a conversation with himself. During Mr. Thomas' short stay at the police station, he was reportedly acting out in his cell, exposing himself, masturbating, and urinating on the windows.

**ANSWER:**    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

43.    After questioning Mr. Thomas, police transferred him to the Milwaukee County Jail in the early-morning hours of April 16, 2016.  Armor employee Carianne Adriano, R.N., conducted an initial health screening, during which Mr. Thomas reported a history of diabetes and high blood pressure.  Despite Mr. Thomas' reported history of diabetes and hypertension, jail medical staff failed to conduct daily blood sugar tests and blood pressure checks during his detention.

**ANSWER:**    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

17

300644049v1 0990034

44.     During the initial health screening, Nurse Adriano also learned that Mr. Thomas had been incarcerated at the jail in 2012 and was housed in a special-needs unit due to known mental health concerns.  Based on this information, as well as her observations of Mr. Thomas, she recommended that he see the jail's psychiatric social worker and that he again be assigned to the special-needs unit – Unit 4C.

**ANSWER:**    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

45.     The special-needs unit is for inmates whose known medical or mental health needs require extra attention or accommodation.

**ANSWER:**    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

46.     Armor employee Joel DeWitt, a psychiatric social worker, also evaluated Mr. Thomas and agreed he should be housed in 4C due to his mental health needs.

**ANSWER:**    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

47.     At all times during his incarceration in the Milwaukee County Jail, Mr. Thomas suffered from an obvious and severe mental condition that required prompt medical intervention and that substantially limited certain of his major life activities, including thinking, communicating, and caring for himself. The Milwaukee County Behavioral Health Division faxed information to the jail stating that Mr. Thomas suffered from bipolar disorder and had been prescribed medication by a psychiatrist.

**ANSWER:**    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

18

300644049v1 0990034

48.     Despite Mr. Thomas' obvious and severe mental health condition and history of bipolar disorder, including a known prescription for psychotropic medication, Defendants failed to provide him with any treatment.  Mr. Thomas never saw a psychiatrist or psychologist during the entire time he remained in Defendants' custody and was never provided any mental health care.

**ANSWER:**   Deny.

49.     In the early-morning hours of Sunday, April 17, 2016, Defendant Kashka Meadors, a jail lieutenant, learned of a disturbance in the special-needs unit.  She was told an inmate was being loud and disruptive and was flooding his cell.  Defendant Meadors knew that the inmates housed in Unit 4C were there because of serious mental or health or medical concerns.

**ANSWER:**   Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

50.     Defendant Meadors then directly observed Mr. Thomas in his cell, shirtless, visibly agitated, and stuffing his shirt and torn pieces of his mattress into his toilet, causing the toilet to overflow and flood the cell.

**ANSWER:**   Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

51.     Mr. Thomas' behavior was an obvious manifestation of his mental illness and lack of medication and treatment.  Although it was obvious he was in the midst of a mental health crisis, Defendant Meador sneer contacted mental health or other medical staff to report what happened or to seek guidance regarding how best to address his condition.  Instead, she decided to punish Mr. Thomas by ordering that he be removed to Unit 4D – the segregation unit.

19

300644049v1 0990034

**ANSWER:** Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

### General Conditions in Unit 4D

52. Detainees sent to Unit 4D for discipline are housed in small, single-person isolation cells. The cells have a solid door with a large window that allows officers to observe the detainees' behavior. The doors are equipped with a "food chute," through which meal trays are passed back and forth.

**ANSWER:** Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

53. Each cell contains a stainless steel fixture that comprises a toilet and a small sink from which inmates can access drinking water 24 hours a day, seven days a week, as required by written jail policy. Detainees housed in 4D for discipline are not provided any water other than that which flows through the sink faucet.

**ANSWER:** Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

54. Next to each cell door is a locked panel that allows access to the in-wall plumbing valves that control the flow of water to the cell. This is referred to as the "pipe chase." Inmates do not have access to the pipe chases.

**ANSWER:** Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

55. At the time Mr. Thomas was house in 4D, the key to unlock the pipe chases was kept in the unit command center, freely available to any officer who wanted to access a pipe chase to turn an inmate's water on or off. In April 2016, if a guard shut off the valves controlling

20

300644049v1 0990034

water to an inmate's cell, the inmate would have no access to drinking or toilet water unless and until the water was turned back on.

**ANSWER:**    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

56.    Pursuant to written jail policy, each detainee in 4D is required to have a padded mattress, a bedsheet, and a blanket.

**ANSWER:**    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

57.    Six days a week, inmates in 4D for discipline do not receive regular meals. Instead, they are fed "nutraloaf," a mishmash of bland ingredients, blended and baked into a solid loaf.

**ANSWER:**    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

58.    Nutraloaf is designed to be punitive.  It is served in the form of a dry, foul-tasting brick that many people find inedible.  May prisoners reject nutraloaf, preferring hunger over the offensive substance.   While missing some meals may not pose a risk of harm to a healthy prisoner, it poses a substantial risk of serious harm to someone with certain dietary needs such as a person with diabetes.

**ANSWER:**    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

59.    The nutraloaf served at the Milwaukee County Jail in April 2016 was particularly dry – so dry that nutraloaf dust set off the fire alarm in Mr Thomas' cell.  Without water, it was extremely difficult to consume.

21

300644049v1 0990034

**ANSWER:**   Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

60.   Detainees in 4D generally are locked in their cells 23 hours per day.  According to jail policy, they are required to be let out of their cells for one hour each day to shower, make phone calls, "exercise" (while in restraints), and get supplies to clean their cell.

**ANSWER:**   Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

### Mr. Thomas' Conditions in Unit 4D

61.   After intentionally ignoring his mental health needs and deciding instead to punish him for the manifestations of his disability, Defendants Meadors, Townes, and other jail staff escorted Mr. Thomas to the disciplinary unit.

**ANSWER:**   Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

62.   Upon arrival, Defendant Meadors ordered Defendants Jams Ramsey-Guy, John Weber, and Dominique Smith, officers assigned to 4D, to remove the mattress from Mr. Thomas' cell and to turn off his water.  She issued these orders in violation of written jail policies, which mandate that staff provide inmates with 24-hour access to water and a mattress.  However, Defendant Meadors' orders were consistent with the jail's widespread practice and custom of ignoring the policies, in violation of minimal constitutional and corrections standards.

**ANSWER:**   Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

63.   Complying with Defendant Meadors' command, Defendant Ramsey-Guy opened the pipe chase next to Mr. Thomas' cell and turned off both the hot and cold water valves, cutting

22

off his sole water supply.  Defendant Ramsey-Guy shut off Mr. Thomas' water supply as part of a regular practice and custom at the jail of withholding water from inmates as a form of punishment.

**ANSWER:**    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

64.    Also in response to Defendant Meadors' command, the mattress from Mr. Thomas' cell was removed, leaving him with nothing to sleep or sit on except cold hard concrete, even though tear-proof mattresses were available at the jail.  Mr. Thomas also was denied access to sheets and a blanket in violation of jail policy.  His cell was stripped of everything except for his jail uniform.  The removal of all bedding, which violated minimal constitutional and correctional standards, reflected a widespread practice and custom at the Milwaukee County Jail.

**ANSWER:**    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

65.    Mr. Thomas was locked in his dell without water, bedding, or the ability to step outside the cell for the remainder of his life.

**ANSWER:**    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

66.    The staff in 4D were inconsistent in offering Mr. Thomas the nutraloaf (the only "food" available to him).  On the occasions when the nutraloaf was offered, Mr. Thomas did not eat it. Jail staff failed to document the times when Mr. Thomas did not received a meal or did not eat it, in violation of jail policy.  Staff's failure to log this important information reflected a widespread and customary practice at the jail.  For diabetics, like Mr. Thomas, not eating

23

300644049v1 0990034

regularly can be dangerous and potentially life-threatening. The failure to provide Mr. Thomas an appropriate diet and water put him at substantial risk of serious harm..

**ANSWER:** Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

67. Contrary to jail policy, the defendants never let Mr. Thomas out of his cell from the time he entered the unit on April 17 until the time of his death on Aril 24, instead, they forced him to spend the last week of his life locked in an isolation cell 24 hours a day, with no drinking water, no edible food, no working toilet, no mattress, no blanket, no shower access, no means of cleaning his cell, no ability to communicate with his family, no relief from constant lockdown, and no meaningful access to urgently needed medical or mental health care. He languished and suffered in this filthy, unsanitary cell with nothing but his jail uniform and the rations of nutraloaf, which, without water, were inedible. This 24-hour lockdown prevented Mr. Thomas from seeking water from any source outside his cell.

**ANSWER:** Deny wrongdoing and/or deprivation of rights. Deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph and put Plaintiff to its proof.

68. Defendants Meadors, Ramsey-Guy, Weber, and Dominque Smith, among others, were all aware that the toilet/sink unit in Mr. Thomas' cell constituted his only water source while he remained in 4D. They obviously knew that depriving a person of water for an extended period causes serious harm and eventually lads to death. Despite this knowledge, the did not document the fact that Mr. Thomas' water had been shut off, inform other jail staff that he had no access to drinking water, ensure that his water access was ever restored, or provide him with any water at any time during his confinement in 4D.

300644049v1 0990034

**ANSWER:** Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

### The Last Week of Mr. Thomas' Life

69. Having received no mental health care since entering the jail, Mr. Thomas spent his first several days in solitary confinement in a blatant state of crisis – naked, creaming, making nonsensical statements, chewing Styrofoam (from the box containing uneaten nutraloaf) and spitting it out, slapping his sandals together, licking the cell door window, and beating his firsts against the walls of his cell. This occurred at all hours of the day and night. At times he was so loud that he prevented other inmates from sleeping.

**ANSWER:** Deny that Mr. Thomas received no mental health care. Deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph and put Plaintiff to its proof.

70. Mr. Thomas' serious medical and/or mental health needs were obvious to all staff who worked in Unit 4D during the first several days of his disciplinary confinement and to the supervisors who came to inspect the unit during that time, including Defendants Sobek, Briggs, Haw, Andykowski, Meadors, Townes, Brito, Carroll, Collins, Drago, Emanuele, Johnson, Laine, Ledger, Legere, O'Donnell, Ramsey-Guy, Decorie Smith, Dominique Smith, and Weber. However, none of these defendants took any action to obtain medical or mental health care for Mr. Thomas. Instead, they did their best to ignore him.

**ANSWER:** Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

25

300644049v1 0990034

71.     Defendant Karen Gray, a psychiatric nurse employed by Armor, visited 4D on a daily basis.  She was aware of Mr. Thomas' serious medical and mental health needs but failed to secure needed care for him.

**ANSWER:**     Deny.

72.     Defendant Amanda Ocacio, a licensed nurse practitioner and Armor employee, reportedly talked to Mr. Thomas multiple times during his confinement in 4D, while he was naked and incoherent.  It was obvious to her that he was experiencing a mental health crisis.  She also knew that he needed his blood pressure and blood sugar tested.  Defendant Ocacio had a duty to provide or secure necessary care for Mr. Thomas' serious medical needs.  However, she failed to do so.

**ANSWER:**     Deny.

73.     Defendant Karen Horton, M.D., the medical director for the Milwaukee County Jail and an Armor employee, knew about Mr. Thomas' condition.  She knew he had a history of diabetes and that his blood wasn't being tested, making it impossible to assess his blood sugar level.  It was incumbent upon her to either personally examine Mr. Thomas or immediately transfer him to an appropriate medical facility.  She did neither.

**ANSWER:**     Deny.

74.     Jail policy requires guards to conduct cell inspections in 4D every 30 mine.  However, the defendants often ignored this requirement.

**ANSWER:**     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

75.     Numerous times before Mr. Thomas died, other inmates in 4D notified multiple defendants, including JorDon Johnson, Decorie Smith, Dominique Smith, Matthew Carroll, and

26

300644049v1 0990034

others, that his water was off or that he needed water. Despite these warning, no officer bothered to turn on Mr. Thomas' water or bring him water to drink.

**ANSWER:** Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

76. Throughout the week, multiple defendant guards walked directly to Mr. Thomas' cell and looked through the cell window. These cell stops ranged from three to four seconds to a minute, during which time the defendant guards were able to clearly see that Mr. Thomas had no mattress or bedding. Yet no defendant attempted to provide Mr. Thomas with these bare minimal necessities of civilize life.

**ANSWER:** Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

77. The defendant guards were aware that Mr. Thomas was not eating. However, none of them documented that fact in the jail log, as required by policy.

**ANSWER:** Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

78. The defendant guards were aware that Mr. Thomas had no mattress or other bedding, in violation of jail policy. However, none of them documented that fact or took any steps to address the violation, thereby forcing Mr. Thomas to continue lying on concrete, usually naked.

**ANSWER:** Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

79. During the first few days of his confinement in 4D, Mr. Thomas asked the guards on duty for water, but none of them gave him any water at any time.

27

**ANSWER:**   Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

80.   On or around Tuesday, April 19, Defendant Emanuele asked Marcus Berry, another inmate on 4D, if Mr. Thomas was "playing around."  Mr. Berry informed him that Mr. Thomas had a serious issue and needed to be on the special-needs unit.  Despite this information, Defendant Emanuele did not take any steps to obtain care for Mr. Thomas' serious medical and/or mental health needs.

**ANSWER:**   Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

81.   On Wednesday, April 20, Mr. Thomas was scheduled to appear in court for the initial appearance on his criminal charge.  When officers arrived to transport him to court, Mr. Thomas was naked and speaking gibberish, singing, and refusing to put on clothes.  When finally dressed, officers refused to transport him to court because he was singing and making unusual movement.  Instead, his attorney, the court commissioner, an assistant district attorney, and a court reporter, came to Unit 4D to conduct the hearing.

**ANSWER:**   Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

82.   During the hearing, Mr. Thomas' attorney, Stephen Sargent, noted that his client was naked, unresponsive to Mr. Sargent's questions, made inappropriate comments, and was unable to speak with Mr. Sargent about his case.

**ANSWER:**   Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

28

300644049v1 0990034

83.     Milwaukee county Court Commissioner Julia Vosper ordered that Mr. Thomas remain in Milwaukee County Sheriff custody for a competency evaluation by a doctor.

**ANSWER:**     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

84.     Defendants violated jail policy and minimal constitutional and correctional standards by allowing Mr. Thomas to remain untreated in his cell and by not securing immediate medical and mental health care for him despite his obvious needs.

**ANSWER:**     Deny.

85.     Also on April 20, Defendants Steven Haw conducted a disciplinary hearing with Mr. Thomas pertaining to the alleged rule violations for which he was sent to 4D.  Defendant Haw conducted the hearing over the jail's intercom system, rather than face-to-face.  He knew Mr. Thomas had been housed on the special-needs unit, and he later admitted he was unable to have a lucid conversation with Mr. Thomas during the hearing.  Nonetheless, he did not make any reasonable accommodation to enable Mr. Thomas to participate in the hearing, and he did not meaningfully consider Mr. Thomas' mental health impairments in making his findings or imposing disciplinary sanctions upon him.  Further, despite Mr. Thomas' serious and obvious medical and/or mental health nee, Defendant Haw did not take any steps to secure necessary care for him.

**ANSWER:**     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

86.     Contrary to jail policy, Defendant Emanuele failed to document that no nutraloaf was given to Mr. Thomas at breakfast on April 21.  This failure was consistent with the widespread and customary practice at the jail.

300644049v1 0990034

**ANSWER:**    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

87.    During lunch service on April 21, Defendant Rafael Brito and an inmate trustee were passing out nutraloaf and walked by Mr. Thomas' cell door without offering him his ration. Defendant Brito failed to document that Mr. Thomas did not receive his meal.

**ANSWER:**    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

88.    On April 22, Defendant Dominique Smith failed to document that no nutraloaf was provided to Mr. Thomas during breakfast or lunch services.  When an inmate expressly informed Defendant Dominque Smith that Mr. Thomas needed his water turned back on, Defendant Smith dismissed the inmate's report by responding, "Its shift-change."

**ANSWER:**    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

89.    At approximately 1:50 p.m. on April 22, Defendants Sobek and Townes responded to a fire alarm going off in Mr. Thomas' cell.  The fire alarm was triggered by dust from the dry, uneaten nutraloaf in his cell.  They were at his cell for approximately one minute and had a clear and unobstructed view through the cell window.  However, both defendants knowingly failed to provide Mr. Thomas with a mattress or bedding.  Instead, they laughed at him and walked away.

**ANSWER:**    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

90.     During dinner service on April 22, Defendant O'Donnell failed to offer Mr. Thomas his ration of nutraloaf.  He walked by Mr. Thomas' cell without even bothering to look inside and failed to log that Mr. Thomas did not receive anything to eat.

**ANSWER:**     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

91.     Defendant Deborah Mayo, a psychiatric nurse practitioner employed by Armor, was responsible for visiting inmates in Unit 4D and saw Mr. Thomas during the last few days of his life.  On April 22, at approximately 7:24 p.m., she went to see Mr. Thomas at the request of a psychiatric social worker.  During her brief interaction with Mr. Thomas, she observed him sitting on the floor, naked, facing the wall, acting strangely, and refusing to come to the door to talk.  Based on her observations, it was obvious that Mr. Thomas was likely experiencing a severe psychiatric issue or an organic medical crisis.  However, she failed to take any action to ensure that Mr. Thomas received the medical care he obviously needed.

**ANSWER:**     Deny.

### The Last 24 Hours of Mr. Thomas' Life

92.     Mr. Thomas' condition deteriorated dramatically as the days passed.  By April 23 he was too weak to yell or bang on his window.  He was simply lying naked on his cell floor, barely able to move, severely dehydrated, literally dying of thirst.

**ANSWER:**     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

93.     The change in Mr. Thomas' condition was obvious to every jail employee who looked into his cell, including multiple defendants.  However, not a single one bothered to call for help until it was too late to save Mr. Thomas' life.

31

**ANSWER:**     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

94.     Mr. Thomas did not eat the nutraloaf offered to him during breakfast service on April 23 which staff failed to log.

**ANSWER:**     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

95.     When an inmate specifically told Defendant Carroll that Mr. Thomas needed water, Defendant Carroll failed to provide any water or other assistance.  He also failed to log that no meal was provided to Mr. Thomas during lunch service on April 23.

**ANSWER:**     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

96.     At approximately 4:06 p.m. on April 23, inmate Marcus Berry went by Mr. Thomas' cell and saw him lying on his floor, naked and moaning.  He saw that Mr. Thomas' lips were white and appeared to be dry.  Mr. Berry went to the officer station and told Defendant Johnson that Mr. Thomas needed water "now" and that he thought Mr. Thomas was dying. Defendant Johnson responded that he couldn't do anything because he was the only officer in the unit.  He said he would give Mr. Thomas water when another officer arrived at 6:00 p.m.

**ANSWER:**     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

97.     Despite Mr. Berry's warning about Mr. Thomas' dire condition and desperate need for water, Defendant Johnson did not call for help.  Nor did he give Mr. Thomas any water when the next officer came on duty two hours later.

32

300644049v1 0990034

**ANSWER:** Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

98. Mr. Thomas was not provided with his ration of nutraloaf during dinner service on April 23, but Defendant Dragoo failed to log this information.

**ANSWER:** Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

99. Later on the 23rd, Marcus Berry also told Defendant Laine that Mr. Thomas needed water. Defendant Laine, who was conducting the required 30-minute cell checks, told Mr. Berry that Mr. Thomas was "sleeping" and didn't need water. Mr. Berry replied, "If this man dies, it's going to be on your hands."

**ANSWER:** Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

100. Defendant Laine observed that Mr. Thomas did not have a mattress. Despite knowing there was a policy requiring inmates to be provided a mattress, Defendant Laine failed to document and report that Mr. Thomas did not have a mattress.

**ANSWER:** Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

101. On April 24, at approximately 12:30 a.m., Defendant Decorie Smith, the only officer posted on Unit 4D at the time, was performing a routine cell inspection when he noticed Mr. Thomas lying naked on his concrete cell floor. He knew Mr. Thomas was "off," but he did not summon any medical help. He also failed to provide Mr. Thomas with water.

**ANSWER:** Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

33

300644049v1 0990034

102. At approximately 12:50 a.m., Defendant Decorie Smith informed Defendant Andrykowski, the shift lieutenant, that Mr. Thomas did not seem right. Defendant Andrykowski ignored this information.

**ANSWER:** Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

103. At approximately 1:00 a.m., during the next regular cell inspection, Defendant Decorie Smith saw that Mr. Thomas was still lying on the floor of his cell, completely naked. He tried to get Mr. Thomas' attention by flashing his flashlight into the cell and kicking the door. Mr. Thomas did not respond. Defendant Smith documented his observations in the jail log and communicated them to Defendant Andrykowski, but neither defendant took any steps to summon help.

**ANSWER:** Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

104. When Defendant Decorie Smith came to Mr. Thomas' cell for the next ell check, at approximately 1:30 a.m., he again tried, unsuccessfully, to get Mr. Thomas' attention. He opened the food chute in the cell door, reached through it, and pulled on Mr. Thomas' foot. Mr. Thomas did not react. At that point, finally, Defendant Smith radioed master control and reported Mr. Thomas' condition. Defendant Andrykowski responded to the unit, along with other officers and medical staff.

**ANSWER:** Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

34

300644049v1 0990034

105.    Staff at the scene were unable to detect a pulse or breathing by Mr. Thomas.  They attempted to resuscitate him, but their efforts were unsuccessful.  Mr. Thomas was pronounced dead at the scene.

**ANSWER:**    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

**B.  Post-Death Investigative Findings**

106.    Shortly after Mr. Thomas was pronounced dead, City of Milwaukee police officers were notified of the death and responded to the jail to investigate.

**ANSWER:**    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

107.    Milwaukee Police Detective Luke O'Day observed that Mr. Thomas' cell contained no mattress or other bedding, that his toilet bowl was bone dry, and that no water came out of the sink faucet.  He was informed that Mr. Thomas' water had been shut off.

**ANSWER:**    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

108.    Detective O'Day observed drops of blood on the floor of Mr. Thomas' cell.  They appeared to be coming from his groin.  Dr. Wieslawa Tlomak, Milwaukee County' deputy chief medical examiner, conducted an autopsy on Mr. Thomas on April 25, 201.  She observed red lesions on his scrotum and inner thighs, consistent with him having been scratching the area or rubbing it against another surface.

**ANSWER:**    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

300644049v1 0990034

109.    Dr. Tlomak determined that Mr. Thomas lost 34 pounds during the eight days he was in Defendants' custody – over ten percent of his body weight.

**ANSWER:**    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

110.    Based on her autopsy findings and other evidence she gathered, Dr. Tlomak concluded that Mr. Thomas died from "profound dehydration" and classified his death as a homicide.

**ANSWER:**    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

111.    In May 2017 the Milwaukee County District Attorney's Office conducted an inquest to examine the circumstances surrounding Mr. Thomas' death.   Martin Horn, a corrections expert with over four decades of criminal justice experience, including as a former secretary of the Pennsylvania Department of Corrections and a former commissioner of the New York City jail system, testified at the inquest that the treatment to which Mr. Thomas was subjected during his confinement in the Milwaukee County Jail was "unconscionable," "inhumane," and served no legitimate penological purpose.

**ANSWER:**

112.    At the conclusion of the inquest, a unanimous 12-person jury found probably cause for the State to charge the following defendants with a Class 1 felony under Wisconsin's prisoner abuse statute (Wis. Stat. §940.29) for their roles in Mr. Thomas' death: Nancy Evans, Kashka Meadors, James Ramsey-Guy, Thomas Laine, John Weber, Dominique Smith, and JorDon Johnson.

36

300644049v1 0990034

**ANSWER:** Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

**C. Attempted Cover-up**

113. Milwaukee County ratified the unconstitutional conduct described in this complaint by engaging in a cover-up designed to obstruct justice and conceal the unconstitutional wrongdoings that took place during Mr. Thomas' confinement.

**ANSWER:** Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

114. Within a day or two of Mr. Thomas' death, Defendant Nancy Evans, commander of the Milwaukee County Jail at the time, ordered Captain George Gold to review the video footage from Unit 4D.

**ANSWER:** Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

115. Captain Gold reviewed the video from the date of Mr. Thomas' boking until the date of his death. He saw Defendant James Ramsey-Guy open the door to the plumbing chase outside of Mr. Thomas' cell on April 17, 2016 – the date Defendant Meadors had given the order to turn off Mr. Thomas' water. He did not see anybody access the plumbing chase again until after Mr. Thomas' death.

**ANSWER:** Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

116. Captain Gold also observed the mattress being removed from Mr. Thomas' cell on April 7 and that during the entire seven days Mr. Thomas remained locked up in segregation he

37

was never released from his cell for his daily "one hour out" to take a shower, clean his cell, make a phone call, or exercise.

**ANSWER:** Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

117. After watching the video, Captain Gold reported to Defendant Evans what he saw. Defendant Nyklewicz was present when Captain Gold reported his findings to Defendant Evans. As the highest-ranking members of the jail command staff after Defendant Clarke and Inspector Richard Schmidt, Defendants Evans and Nyklewicz were knowledgeable about the jail's policies, practices and procedures. They were aware that the jail's video surveillance system would record over the footage unless steps were taken to preserve it. The footage showed multiple violations of jail policy and was material to an in-custody death investigation, but Defendants Evans and Nyklewicz did nothing to preserve the video and did not disclose to investigators what the video showed. Instead, they perpetrated a post-incident cover-up, designed to obstruct justice, ratify the unconstitutional conduct of the other defendants, and conceal the truth from Mr. Thomas' family and the public.

**ANSWER:** Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

118. When police requested the video footage in July 2016, only the portion from April 21 through April 24 was still available. Earlier footage, including the footage showing staff shutting off Mr. Thomas' water and removing his mattress had been recorded over.

**ANSWER:** Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

38

300644049v1 0990034

119.    On July 11, 2016, Defendants Evans and Nyklewicz co-authored a memo addressed to city of Milwaukee Police Lieutenant Eric Donaldson in response to twelve questions posed by Lt. Donaldson regarding the water shut off.  In a continuing attempt to cover up the fact that the death was a result of the jail's practice and custom of punitively shutting off inmates' water, Defendants Evans and Nyklewicz intentionally provided incomplete and misleading information to evade question number ten, which inquired as follows: "Was the water continuously off or was it turned on intermittently?"  Even though both knew from Capt. Gold that the water was continuously off from April 17, 2016 through Mr. Thomas' death, they responded, "There is no documentation indicating this."

**ANSWER:**    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

120.    Police investigators interviewed Defendant Evans in March 2017.  When asked about the video footage, she lied and stated she instructed Captain Gold to review the surveillance video more than two months after Mr. Thomas' death, and that all footage prior to April 21 had been lost by that point.

**ANSWER:**    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

121.    Two days later, investigators from the Milwaukee District Attorney's Office went to the jail and seized the computer server on which surveillance video was stored.  Realizing that investigators would now learn when Captain Gold had actually reviewed the video, Defendant Evans had her lawyer contact the police so she could schedule a second interview and "correct" her prior statement.

39

300644049v1 0990034

**ANSWER:**     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

122.     Milwaukee County also ratified Defendants' unconstitutional conduct by failing to discipline any of the involved personnel for the inhumane practices and policy violations that were plainly evident on the video and otherwise evident from widely available information about what occurred.

**ANSWER:**     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

**D.  Additional Allegations Regarding Milwaukee County and Jail Supervisors**

123.     The written policies governing conditions at the Milwaukee County Jail required staff to provide inmates with 24-hour access to water.  However, there was a widespread custom and practice of ignoring this policy.  Staff regularly turned off inmates' water to punish them for alleged misbehavior or to compel compliance with a staff directive.  The district attorney's inquest revealed that this practice took place before Mr. Thomas' death and continued after his death.  The practice occurred with the knowledge, approval, or direction of supervisory officers and officials of the Milwaukee County Jail, including Sheriff Clarke.  When Mr. Thomas' water was shut off, it was done pursuant to a lieutenant's order that was followed without question.

**ANSWER:**     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

124.     Prior to Mr. Thomas' death, Defendants Clarke, Evans, Nyklewicz, Andrykowski, Briggs, Haw, Meadors, Sobek, and Townes were each aware that the jail's written policies required staff to provide inmates with 24-hour access to water.  They were aware that it violated the jail's written policies and basic corrections standards for staff to withhold water from an

40

300644049v1 0990034

inmate as punishment for misbehavior. And they were aware that, notwithstanding the jail's written policies, it was a regular practice among staff to cut off inmates' access to water for punitive reasons. Yet these supervisory defendants either actively participated in Mr. Thomas' deprivation of water or they acquiesced in this inhumane conduct by personally directing it, tacitly authorizing it, or otherwise failing to train or supervise their subordinates. It was foreseeable that these actions and inactions would cause harm to detainees, including Terrill Thomas, and such actions and inactions in fact caused his unnecessary suffering and death.

**ANSWER:** Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

125. In addition to depriving inmates of water, the County permitted to exist a pattern, practice, or custom of other forms of unconstitutional conduct towards its detainees for punitive reasons, including depriving inmates of edible food, bedding, and other humane conditions of confinement described in this complaint. These practices occurred with the knowledge, approval, and direction of supervisor officers and officials of the Milwaukee County Jail, including Sheriff Clarke. When these inhumane practices were inflicted on Mr. Thomas, they were done pursuant to a lieutenant's orders or official policy and with the widespread knowledge that it was taking place throughout his confinement.

**ANSWER:** Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

126. The victims of the above-described unconstitutional disciplinary practices include mentally ill inmates. It was widely known, for example, that when Defendants were subjecting Mr. Thomas to these inhumane conditions of confinement, he was suffering from a severe mental illness. These practices have been known to these defendants, including Sheriff Clarke, since at

41

300644049v1 0990034

least 2011, when a mentally ill inmate named Antonio Cowser died after not eating for five days and having the water in his cell turned off.

**ANSWER:**    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

127.    Milwaukee County also engaged in a widespread pattern, practice, or custom of withholding necessary care from detainees with serious medical and mental health needs, including those suffering from mental illness, dehydration, malnourishment, diabetes, high blood pressure, and other serious conditions.

**ANSWER:**    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

128.    In June, 2001, Milwaukee County and the Milwaukee County Sheriff's Office entered into a Consent Decree with a class of all current and future County detainees.  *See Christensen v. Sullivan,* Case No. 1996-CV-1835 (Milwaukee County Circuit Court).   The Consent Decree required Milwaukee County to ensure adequate staffing with well-trained healthcare providers and mandated complete mental health screenings and mental health care. As part of the Consent Decree, the court appointed a medical monitor, Dr. Ronald Shansky, to supervise the County's compliance with the decree.

**ANSWER:**    Admit that a consent decree was entered in Milwaukee County Case No. 1996-CV-1835, part of which dealt with medical services provided to inmates. Deny any allegations inconsistent with the consent decree, which speaks for itself

129.    During his time as monitor, Dr. Shansky has discovered and documented multiple systemic problems in the jail's healthcare system.  Most recently, in a November 15, 2016 report, which is incorporated herein by reference, Dr. Shansky found that "health care staffing shortages

42

contribute to delays in access to care and deterioration in quality of care for prisoners[.]" He also found that "reduction in the number of correctional officers contribute to a dangerous lack of access to health care, and may have played a role in some of the recent deaths at the Jail." I a discussion about Terrill Thomas, Dr. Shansky noted several deficiencies with respect to what happened at the intake screening and to "the mental health team's urgency of their assessments." Furthermore, after pointing out that Mr. Thomas died of dehydration, Dr. Shansky concluded that the "shortage of officer staff at the jail" leaves open the question "whether more careful monitoring of him might have altered the outcome."

**ANSWER:** Admit that a consent decree was entered in Milwaukee County Case No. 1996-CV-1835, part of which dealt with medical services provided to inmates. Further admit that Dr. Shansky has published reports. Deny any allegations inconsistent with the consent decree and reports, which speak for themselves.

130. At all times material to this case, Defendants Clarke, Evans, Nyklewicz, and other policy makers were aware of the systemic deficiencies cited by Dr. Shansky and lack of compliance with the *Christensen* Consent Decree. They had the authority and duty to rectify these deficiencies. It was foreseeable that the failure to do so would cause harm to inmates, including Mr. Thomas, but they chose not to remedy the systemic deficiencies. This deliberate inaction caused the unnecessary suffering and death of Terrill Thomas.

**ANSWER:** Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

131. Defendant Milwaukee County failed to adequately train and/or supervise its personnel and contract providers on complying with constitutional requirements pertaining to inmate medical and mental health care, food, water, and humane conditions of confinement, as

43

300644049v1 0990034

well as the proper way to monitor inmates in solitary confinement. The County failed to provide training or managing, monitoring, and responding to detainees in mental health crisis, such as an individual suffering from an acute episode related to bipolar disorder. The need for this training was obvious, and it was foreseeable that the County's choice not to provide such training would cause serious harm to inmates like Mr. Thomas.

**ANSWER:** Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

132. Defendant Milwaukee County and Sheriff Clarke delegated final policy-making authority regarding jail healthcare to Defendant Armor. Despite this, the County and Sheriff Clarke had a continuing, non-delegable duty to ensure that its corporate policymaker was fulfilling its constitutional duties to detainees.

**ANSWER:** Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

133. Milwaukee County adopted and ratified the policies, customs, and practices of Defendant Armor as its own. As such, the County is liable for any unconstitutional corporate policies, customs, or practices that resulted in harm to any detainees in the jail, including those that caused the death of Terrill Thomas.

**ANSWER:** Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

134. It was foreseeable that such policies, customs, and practices would put the lives of Milwaukee County jail detainees at risk, and such policies and customs caused and/or substantially contributed to the death of Mr. Thomas.

44

300644049v1 0990034

**ANSWER:**    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

135.    Milwaukee County knew that the above-describe policies, practices and customs posed a substantial risk of serious harm to detainees like Mr. Thomas, and it was obvious that such harm would occur.  Nevertheless, the County chose not to take reasonable steps to alleviate those risks.

**ANSWER:**    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

136.    There is an affirmative causal link between the policies, practices, and customs described in this complaint and Mr. Thomas' suffering and death.

**ANSWER:**    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

137.    The actions and inactions of Milwaukee county and its Sheriff's Office were committed unde color of state law and were the direct and proximate cause of Mr. Thomas' damages, including his pre-death pain and suffering and death.

**ANSWER:**    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

**E.  Additional Allegations Regarding Armor and Defendant Horton**

138.    Defendant Armor permitted to exist a widespread pattern, practice, or custom of unconstitutional conduct toward persons incarcerated at the Milwaukee County Jail, including failing to provide necessary care to inmates in segregation with serious medical and mental health needs.

**ANSWER:**    Deny.

45

300644049v1 0990034

139.    By the time of Mr. Thomas' detention, there had been numerous instances in the Milwaukee County Jail (and in other correctional facilities where Armor operated) of inmates being denied prescription medication and other need medical care by Armor and its employees. Failing to conduct blood pressure checks and blood sugar tests was commonplace, even in the face of physician orders to conduct such checks and tests.

**ANSWER:**    Deny.

140.    Armor's failure to deliver needed medical care to Mr. Thomas was motivated by constitutionally impermissible profit-driven reasons.  The company had a widespread policy, practice, and custom of budgeting and spending inadequate amounts on jail medical care to make higher profits on its contract.  It was foreseeable that the insufficient budgeting and spending would cause harm to detainees in need of medical care, and such conduct caused or substantially contributed to Mr. Thomas' unnecessary pain, suffering, and death.

**ANSWER:**    Deny.

141.    Armor also had a widespread pattern, practice, and custom of failing to properly monitor inmates with serious medical or mental health needs, particularly those in the segregation unit.

**ANSWER:**    Deny.

142.    Armor failed to adequately train its personnel to recognize and respond to the serious medical needs of inmates, particularly those with mental illness.  This was evident, for example, in the practice of ignoring the need for physician ordered medical monitoring when mentally ill inmates would "refuse" such monitoring as a result of their impaired mental state or inability to consent.  The need for this training was obvious because Armor hired medical staff

46

300644049v1 0990034

with little or no correctional-medical experience, and it was foreseeable that the lack of such training would cause harm to inmates.

     **ANSWER:**    Deny.

143.    Armor also failed to train its nursing staff on how to conduct proper medical examinations, including the need to conduct blood pressure and blood sugar tests where indicated. The need for this training was obvious, and it was foreseeable that such training deficiencies would cause harm to inmates.

     **ANSWER:**    Deny.

144.    In addition to the healthcare deficiencies identified in his November 2016 report, discussed above, Dr Shansky, the medical monitor from the *Christensen* case, issued a report in May 2016, pointing out the "instability" in Armor's "administrative leadership and nursing leadership." He expressed concern that "17 of the 31 registered nurse positions were vacant at the time of [his] visit," which occurred less than a month after Mr. Thomas died. He also found numerous vacancies in licensed practical nurse and nurse practitioner positions. Incredibly, he noted that "more than 30% of the total required positions [were] currently vacant." Dr. Shansky concluded that this vacancy rate was "clearly not acceptable" and that "providing reasonable quality services in a timely fashion is extremely problematic when such a high vacancy rate exists." He also found that the chief psychiatrist was providing services only two days per week at the jail and concluded that the main problem with regard to mental health appears to be a deficiency of prescribers and adequate presence of psychiatric leadership."

     **ANSWER:**    Admit that a consent decree was entered in Milwaukee County Case No. 1996-CV-1835, part of which dealt with medical services provided to inmates. Further admit that

47

300644049v1 0990034

Dr. Shansky has published reports. Deny any allegations inconsistent with the consent decree and reports, which speak for themselves. Deny all remaining allegations.

145.    Alarming deficiencies in screening, staffing, monitoring and the delivery of medical and mental health care were also identified in previous reports and were otherwise known and obvious to Armor for years prior to Mr. Thomas' death.  Despite this knowledge, Armor and its corporate officials chose not to rectify the problems, putting the lives of its incarcerated patients at risk.

**ANSWER:**    Admit that a consent decree was entered in Milwaukee County Case No. 1996-CV-1835, part of which dealt with medical services provided to inmates. Further admit that Dr. Shansky has published reports. Deny any allegations inconsistent with the consent decree and reports, which speak for themselves. Deny all remaining allegations.

146.    Defendant Horton was aware of Armor's systemic deficiencies and lack of compliance with the *Christensen* Consent Decree.  She had the authority and duty to rectify these deficiencies.  It was foreseeable that the failure to do so would cause harm to inmate, including Mr. Thomas, but she chose not to remedy them.  This deliberate inaction caused the unnecessary suffering and death of Mr. Thomas.

**ANSWER:**    Deny.

147.    Defendant Horton also had a duty to oversee her subordinates and ensure compliance with medical standards of care.  She either actively participated in the sub-standard care described in this complaint, or she acquiesced in the conduct by personally directing it, tacitly authorizing it, or otherwise failing to train or supervise her subordinates.   It was foreseeable that these actions and inactions would cause serious harm to detainees, including Mr. Thomas, and in fact they caused his unnecessary suffering and death.

48

300644049v1 0990034

**ANSWER:**   Deny.

148.    The corporate policies, practices, and customs described above were a moving force behind Mr. Thomas' suffering and death and the constitutional violates alleged in this complaint.

**ANSWER:**   Deny.

149.    Armor ratified the unconstitutional conduct of its employee and agents with respect to the mistreatment and death of Terrill Thomas.   Despite clear evidence of unconstitutional misconduct, including the failure to treat Mr. Thomas' severe mental health needs and video evidence of Armor employees failing to conduct mandated checks, Armor tacitly condoned these deficient actions by failing to adequately investigate what happened and failing to discipline the responsible healthcare providers.

**ANSWER:**   Deny.

## V.    CLAIMS FOR RELIEF

150.    The conditions under which Mr. Thomas was confined were torturous, beyond all bounds of human decency, and in violation of his rights under the Fourteenth Amendment to the United States Constitution, the Americans with Disabilities Act, and Wisconsin law.   From the beginning of his pretrial detention until his wholly voidable death on April 24, 2016, Defendants repeatedly and continuously violated Mr. Thomas' well-established rights, resulting in over a week of mental and physical agony, culminating in his unnecessary death.

**ANSWER:**   Deny.

**A.  Claims Against Individual Defendants**

151.    Based on the allegations in the complaint, all individual defendants are liable under 42 U.S.C. §1983 for violating Mr. Thomas' rights under the Fourteenth Amended to the

49

300644049v1 0990034

United States Constitution by denying him necessary medical and mental health care. Each defendant acted objectively and unreasonably by denying him necessary medical and mental health care. Each defendant acted objectively unreasonable, with a lack of professional judgment, and with deliberate indifference to Mr. Thomas' serious medical and mental health needs. Each defendant was aware of the foreseeable risks associated with his or her actions and inactions, which resulted in Mr. Thomas' unnecessary suffering and death.

**ANSWER:** Deny.

152. The individual County defendants are liable under 42 U.S.C. §1983 for violating Mr. Thomas' Fourteenth Amendment rights by depriving him of the minimal civilized measure of life's necessities, including drinking water, edible food, a mattress, bedding, a working toilet, time out of his cell, and a sanitary living environment. Each of these defendants was aware of the foreseeable risks associated with his or her actions and inactions, which resulted in Mr. Thomas' unnecessary suffering and death. They acted objectively unreasonably and with deliberate indifference to those risks.

**ANSWER:** Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

153. The actions and inactions of all individual defendants described in this complaint were committed with intent, malice, and/or with reckless disregard for Mr. Thomas' federal constitutional rights.

**ANSWER:** Deny.

**B. Claims Against Milwaukee County**

154. Based on the allegations in this complaint, Milwaukee County is liable under 42 U.S.C. §1983 for maintaining unconstitutional policies, practices, and customs that resulted in

50

300644049v1 0990034

the violation of Mr. Thomas' clearly established Fourteenth Amendment right to adequate medical and mental health care and to the minimal civilized measure of life's necessities. These violations caused Mr. Thomas' death, as well as needless pain and suffering, including emotional harm, during the week preceding his death.

**ANSWER:** Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph and put Plaintiff to its proof.

155. Milwaukee County violated the Americans with Disabilities Act, 42 U.S.C. §12101 *et.seq.,* by punishing Mr. Thomas for manifestations of his mental illness, thereby intentionally discriminating against him on account of his disability. Through the acts and omissions of its contractor, Armor, the county also failed to reasonably accommodate Mr. Thomas' mental illness, which was necessary to provide him equal access to the jail's programs and services. These violations, which the County committed with discriminatory animus and/or deliberate indifference, caused Mr. Thomas' death, as well as needless pain and suffering, including emotional harm, during the week preceding his death.

**ANSWER:** Deny.

## C. Claims Against Armor Correctional Healthcare Services, Inc.

156. Based on the allegations in this complaint, Defendant Armor is liable under 42 U.S.C. §1983 for maintaining unconstitutional policies, practices and customs that resulted in the violation of Mr. Thomas' clearly established Fourteenth Amendment rights to adequate medical and mental health care and to the minimal civilized measure of life's necessities. These violations caused Mr. Thomas' death, as well as needless pain and suffering, including emotional harm, during the week preceding his death.

**ANSWER:** Deny.

51

157. All acts and omissions committed by Armor were committed with intent, malice, and/or reckless disregard for Mr. Thomas' federal constitutional rights.

**ANSWER:** Deny.

158. Based on the allegations in this complaint, Armor is liable for negligence under Wisconsin law. Armor had a duty to provide Mr. Thomas with competent screening, medication management, treatment, and other psychiatric and medical care. Armor breached its duties, causing Mr. Thomas' pain, suffering, and death. Armor is vicariously liable, based on respondeat superior, for Mr. Thomas' injuries sustained as a result of the negligent acts of its employees and agents.

**ANSWER:** Deny.

159. Armor also had a duty to adequately staff the Milwaukee County Jail with nursing and medical health providers. Amor breached that duty, which was a cause of Mr. Thomas' pain, suffering, and death.

**ANSWER:** Deny.

160. Armor further had a duty to adequately train and supervise its employees, agents, and Milwaukee County employees assigned to work in the jail. Armor breached that duty, causing Mr. Thomas' pain, suffering and death.

**ANSWER:** Deny.

## VI.    JURY DEMAND

161. The plaintiff demands a trial by jury.

**ANSWER:** No response is necessary. These Defendants also demand a jury trial.

300644049v1 0990034

# AFFIRMATIVE DEFENSES

AS AND FOR SEPARATE AFFIRMATIVE DEFENSES, these Defendants allege as follows:

1.     Plaintiff fails to state a claim upon which relief may be granted against these Defendants.

2.     These Defendants are not proper parties to this action.

3.     These Defendants were not deliberately indifferent to a serious medical need, nor do they have Monell liability. As such, Plaintiff's claims must be dismissed.

4.     These Defendants acted in good faith at all times and are entitled to immunity.

5.     Defendants' liability, if any, is subject to a maximum total recovery of $50,000.00 pursuant to § 893.80(3), Wis. Stats., or otherwise under Wisconsin law.

6.     Plaintiff's claims are barred for failure to comply with the Notice of Claim and Notice of Injury provisions of §893.80(1), Wis. Stats.

7.     Plaintiff may have failed to exhaust its administrative remedies before filing this suit.

8.     Mr. Thomas may have been negligent with respect to his own well-being.

9.     Mr. Thomas' condition is the result of pre-existing injury or natural disease progression beyond the control of, and unrelated to, the acts, omissions, or conduct of these Defendants.

10.     Mr. Thomas and/or Plaintiff may have failed to mitigate their damages.

11.     The alleged injuries and/or damages are the result of superseding and/or intervening factors.

53

300644049v1 0990034

12.     The alleged damages are the result of the negligence of third parties for whom these Defendants have no right or obligation to control and on whose behalf these Defendants are not obligated to pay damages.

13.     Plaintiff may have filed to name all necessary and indispensable parties.

14.     Plaintiff lacks standing to assert some or all of the claims asserted.

15.     The Estate lacks legal capacity to assert the claims that have been asserted.

16.     Any and all damages are barred by and contrary to public policy.

17.     Plaintiff cannot recover punitive damages against these Defendants.

18.     These Defendants are not jointly and severally liable for the claimed damages.

19.     These Defendants incorporate by reference all defenses set forth under Rule 12 of the Federal Rules of Civil Procedure.

20.     These Defendants reserve all other affirmative defenses should any be validated through discovery and specifically deny they are liable to Plaintiff for any alleged damages.

21.     These Defendants incorporate by reference, as though fully set forth here, all affirmative defenses pled by other parties.

WHEREFORE, these Defendants respectfully demand judgment dismissing all claims alleged against them on the merits, with prejudice and with fees, costs and disbursements and such other relief as the Court deems equitable.

**THESE DEFENDANTS DEMAND A JURY TRIAL.**

54

300644049v1 0990034

Dated this 14th day of November, 2017.

/s/ Mollie T. Kugler

Michael P. Russart
State Bar No. 1023128
Mollie T. Kugler
State Bar No. 1093318
Attorneys for Defendants ARMOR
CORRECTIONAL HEALTH SERVICES,
INC., KAREN HORTON, KAREN GRAY,
AMANDA OCACIO and DEBORAH MAYO
**HINSHAW & CULBERTSON LLP**
100 E. Wisconsin Avenue
Suite 2600
Milwaukee, WI 53202
Phone No. 414-276-6464
Fax No. 414-276-9220
E-mail Address(es):
mrussart@hinshawlaw.com
mkugler@hinshawlaw.com

55

300644049v1 0990034